UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 5:19-CR-50112-JLV |
| Plaintiff, | |
| vs. | REPORT AND RECOMMENDATION |
| LYLE HOLTON, | |
| Defendant. | |

Pending is Defendant's Motion to Suppress Evidence. (Doc. 112).  A hearing was held on Wednesday, July 20, 2022.  Defendant was personally present representing himself pro se, and was accompanied by his stand-by counsel, Michael W. Strain.  The Government was represented by the Assistant United States Attorney, Gina Nelson.  Two witnesses testified at the hearing, and eight exhibits were received into evidence.  Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

**RECOMMENDATION**

It is respectfully recommended that Defendant's Motion to Suppress Evidence be denied.

## JURISDICTION

Defendant is charged in an Indictment with Distribution of a Controlled Substance Resulting in Serious Bodily Injury in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A).  (Doc. 1).  The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and United States District Judge Jeffrey L. Viken's Standing Order dated April 1, 2018.

## FACTUAL BACKGROUND

In July of 2018, Jennifer Mink was arrested for a probation violation related to a drug conviction.  At the time of her arrest, she tested positive for illegal drugs.  Ms. Mink was not the subject of a drug conspiracy investigation at that time.

However, law enforcement became aware of Ms. Mink and her potential involvement in drug distribution in February of 2019 when a source of information (SOI-1) provided information to law enforcement that they had been purchasing heroin, meth, and Opana pills from Ms. Mink and/or Aubrey Hansen daily, in quantities ranging from 1 gram to 3.5 grams to an ounce. SOI-1 advised that Ms. Mink had been supplying them for several years.  SOI-1 advised that Ms. Mink and Ms. Hansen would travel to Denver to pick up the drugs and thought they brought back a few ounces each time.  SOI-1 advised where Ms. Mink lived and Ms. Mink's various vehicles, which information was corroborated by law enforcement.

In March of 2019, a second source of information (SOI-2) provided information to law enforcement that "Jen" was a source of supply for heroin and described the general location where "Jen" lived.  This information was consistent with what law enforcement knew about Ms. Mink.

Subsequently, a search warrant was issued by a Pennington County judge to install video surveillance equipment on Ms. Mink's residence in Rapid City, and the equipment was installed.  Through the surveillance, a female matching Ms. Mink's description was seen coming and going from the residence in a green 2004 Chevy Suburban (registered to Ms. Mink's significant other).

In April of 2019, law enforcement conducted a trash pull at Ms. Mink's residence.  Notable items recovered include syringes and two jewelry baggies that field tested positive for methamphetamine. On May 4, 2019, Ms. Mink was again arrested for a probation violation for having a urinalysis device on her person when she was required to submit a urine sample.

On May 6, 2019, law enforcement learned from a third source of information (SOI-3) that Ms. Mink was selling drugs out of hotels on Elk Vale Road in Rapid City and that she drove a dark colored SUV.  That same day, law enforcement applied for and was granted a search warrant by a Pennington County judge to place an electronic tracker on the green 2004 Chevy Suburban.  The tracker was placed on the Suburban the next day.

On May 15, 2019, law enforcement started tracking a trip of the Suburban heading south on Highway 79, which law enforcement believed was

a trip to Denver to pick up drugs. Gas station video showed that Ms. Mink was traveling with an unknown male (later determined to be Mr. Holton) in the Suburban. The Suburban arrived in Denver on May 15, 2019, and left the next day, May 16, 2019. The tracker showed the Suburban traveled to Cheyenne, Wyoming where it stopped at a hotel for the night. On May 17, 2019, the Suburban began traveling back to South Dakota. Law enforcement knew that the Suburban was registered to Ms. Mink's significant other so believed it was likely she was still in the vehicle.

On May 17, 2019, law enforcement coordinated with the South Dakota Highway Patrol to have the vehicle stopped upon its return to South Dakota. Detective Ryan Gebhard, a detective with the Rapid City Police Department and member of the Unified Narcotics Enforcement Team (UNET) conducted a briefing. South Dakota Highway Patrol Troopers Stuart Griffith and Khrista Nelson were in attendance, along with other law enforcement personnel. At this briefing, Detective Gebhard provided a brief summary of the investigation, a description of the Suburban, a description of Ms. Mink, that she was likely with an unknown male, that the Suburban was coming back from Denver, and that Ms. Mink was believed to be a source of supply for drugs in Rapid City. Detective Gebhard advised Troopers Griffith and Nelson to attempt to find reasonable suspicion or probable cause to stop the vehicle aside from the current investigation, but if they were unable to develop independent probable cause, then stop the vehicle based on the investigation.

4

Law enforcement had surveillance units set up along the route the Suburban was traveling.  Once back in South Dakota, the Suburban travelled on Highway 79 by Hot Springs heading towards Rapid City.

Troopers Griffith and Nelson stationed themselves in their patrol vehicles closer to Rapid City in a median crossover near mile marker 65 on Highway 79 in Pennington County, a four-lane highway with two lanes in both directions.  Surveillance units continued to relay information on the Suburban's location as it traveled towards Rapid City, they also advised that a male was driving the Suburban.

Trooper Griffith then observed a green Chevy Suburban traveling northbound with two visible occupants, with the male driving.  Trooper Griffith believed this to be Ms. Mink's Suburban.  Trooper Griffith began following the Suburban northbound.  The Suburban then began passing another northbound vehicle that was passing a trailer.  Trooper Griffith used his radar to obtain the Suburban's speed.  The radar gave a reading of 66 miles per hour.  Trooper Griffith followed the vehicle for several miles and eventually activated his lights and conducted a traffic stop of the Suburban.  At this point, they were located at the intersection of Highway 79 and Lower Spring Creek Road.

Trooper Griffith approached the driver's side of the Suburban and explained the reason for the stop (speeding); he advised he would issue a warning.  The driver was identified as Lyle Holton by his driver's license and the front passenger was identified as Jennifer Mink by her driver's license.  Trooper Griffith deployed his canine, Sem and the dog alerted to the odor of an

5

illegal drug.  Both subjects were handcuffed and searched.  Ultimately, approximately 1.5 ounces of heroin was located on Ms. Mink's person and a plastic bag with heroin residue was found in Mr. Holton's mouth.  The vehicle was also searched which located additional items relating to drug distribution, heroin injection/use supplies, prescription medications, and "overdose prevention kits."

## DISCUSSION

Mr. Holton filed the present Motion to Suppress Evidence in which he argues that the stop was invalid because officers did not have reasonable suspicion or probable cause to pull over the Suburban Mr. Holton was driving. (Doc. 112).  The Government opposes the Motion to Suppress Evidence.  (Doc. 118).

### I.    The Stop of the Vehicle was Constitutional

The Fourth Amendment of the U.S. Constitution provides the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  In terms of the Fourth Amendment, the law is settled that "a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  Brendlin v. California, 551 U.S. 249, 255 (2007) (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  "For purposes of constitutional analysis, a

6

traffic stop is characterized as an investigative detention, rather than a

custodial arrest. . . .  As such, a traffic stop is governed by the principles

of Terry v. Ohio . . . ."  United States v. Jones, 269 F.3d 919, 924 (8th Cir.

2001) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Terry v. Ohio,

392 U.S. 1 (1968)).

Therefore, to be valid pursuant to the Fourth Amendment, a traffic stop

"must be supported by reasonable suspicion or probable cause."  United States

v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008) (internal citations omitted).

> A law enforcement officer has reasonable suspicion when the officer
> is aware of particularized, objective facts which, taken together with
> rational inferences from those facts, reasonably warrant suspicion
> that a crime is being committed.  The more rigorous standard of
> probable cause exists when the totality of the circumstances
> justifies the belief that a crime has been committed and the person
> being seized committed it.

Id. (internal quotations omitted).  "An officer has probable cause to conduct a

traffic stop when he observes even a minor traffic violation.  This is true even if

a valid traffic stop is a pretext for other investigation."  United States v. Sallis,

507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted).

Here, Trooper Griffith testified that he used his radar to get a reading of

the Suburban's speed, which radar gave a reading of 66 miles per hour.  South

Dakota sets a maximum speed of 65 miles per hour on a highway.  SDCL § 32-

25-1.1.  Nevertheless, Trooper Griffith was candid that he had been asked to

develop his own reasonable suspicion or probable cause to stop the Suburban

but would have conducted a traffic stop of the Suburban regardless based on

the drug investigation.  Detective Gebhard also testified that he advised the

7

troopers to conduct a traffic stop of the Suburban even if they were unable to develop their own independent reasonable suspicion or probable because he believed probable cause already existed based on the drug investigation.

The court finds the stop was constitutional.  Trooper Griffith had probable cause for the stop of the Suburban based on the ongoing investigation concerning a conspiracy to distribute controlled substances.  Three sources of information, all determined to be credible by law enforcement, independently implicated Ms. Mink in drug trafficking activities.  One informant, SOI-1 who had been purchasing drugs from Ms. Mink for several years, provided information that Ms. Mink went to Denver to pick up drugs and bring them back to Rapid City.  SOI-1 and SOI-2 were able to identify Ms. Mink's residence, leading to the video surveillance, which provided information that Ms. Mink drove the Suburban, and the trash pull where baggies of methamphetamine were found.  Approximately two weeks before the traffic stop, SOI-3 identified Ms. Mink as selling drugs out of hotels in Rapid City and corroborated that Ms. Mink drove a dark colored SUV.  In addition, Ms. Mink's criminal history involved a drug conviction and two probation violations.

These facts provide probable cause to suspect Ms. Mink went to Denver to purchase drugs and transport them back to South Dakota for distribution. This is not a case where Ms. Mink simply traveled to an area where drugs are often purchased.  Law enforcement had specific intelligence that Ms. Mink purchased drugs from Denver and was selling them in Rapid City.  Ms. Mink was then observed traveling in the Suburban in the direction of Denver, gas

8

station video showed Ms. Mink in the Suburban, the Suburban arrived in Denver, stayed for approximately a day and then began a trip back to South Dakota with an overnight stop in Cheyenne, Wyoming.  Law enforcement was entitled to stop the Suburban based on this information alone, regardless of whether Mr. Holton, as driver of the Suburban committed any traffic violations.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 112) be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 19th day of August, 2022.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge